# Exhibit A

**MATSIKOUDIS & FANCIULLO, LLC**
270 Marin Boulevard
Jersey City, NJ 07302
T: (201) 915-0407
Attorney for Plaintiffs
City of Newark

| | |
|---|---|
| THE CITY OF NEWARK,<br>NEW JERSEY | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION, ESSEX COUNTY |
| Plaintiff, | DOCKET NO: |
| v. | |
| E.I. DUPONT DE NEMOURS AND CO.,<br>HEUBACH GMBH, ALENT, PLC,<br>ENTHONE, INC. AND JOHN DOES 1-10 | **COMPLAINT**   MAR – 9 2015 |
| Defendants | FINAL OF DIVISION<br>RECEIVED/FILED |

Plaintiff the City of Newark, New Jersey ("Newark" or the "City") hereby complains and alleges as follows:

## PRELIMINARY STATEMENT

1.      For more than a century, Defendants E.I DuPont de Nemours and Company ("DuPont"), Heubach GmbH ("Heubach"), and Alent, PLC and Enthone, Inc. (collectively, "Cookson"), owned the nearly 15-acre property at 256 Vanderpool Street, Newark, New Jersey (the "Property"), and thereon operated what was primarily a pigment manufacturing facility (the "Vanderpool Facility").

2.      Though highly profitable, the pigment manufacturing process is especially destructive to the environment.  Indeed, the Environmental Protection Agency has classified as Hazardous Wastes nearly all of the chemicals used in and generated as byproducts of the pigment production process, meaning, by *definition*,

these chemicals "pose a substantial present or potential hazard to human health or the environment." 40 C.F.R. 261.11(a)(3).

3.      To this end, the Defendants effectively pillaged the Property in the name of profit.  For instance, across its operational existence, the Vanderpool Facility used, produced and discharged into the environment – i.e., *dumped* into the Property's grounds and groundwater - alarming volumes of Hexavalent Chromium, a highly toxic carcinogen, and Lead, which, even at low levels, can be deadly.

4.      Even worse, Defendants have done virtually *nothing* over the past *three decades* to clean up the extensive contamination they created and/or caused at the Property.

5.      Consequently, since *at least* 2002, the Property has sat derelict – unused and empty.

6.      Alas, the Property sits in Newark's Ironbound Section – home to some of the City's hottest, most developable properties. As such, beyond endangering the citizens who live and work in its close proximity, the Property's contaminated condition has scared away development. Multiple developers have shown interest in purchasing and developing the Property – only to shy away from it when they realized the severity of its contamination (and their resultant potential liability).

7.      Even when developers have attempted to move forward plans to build out the Property *despite* its contamination, they have been thwarted - the State of New Jersey has *stopped development* of the Property due to its severe contamination.

8.      Beyond imperiling her citizens, the Defendants have thus cost Newark

2

tens of millions of dollars.  For decades, the City has been forced to stand by and watch what should be one of its most valuable properties sit vacant and disused due to the Defendants' contamination – creating a 15-acre hole in one of the City's most developable areas. Newark has thus lost out millions of dollars of tax revenues it should have received *but for the Defendants' failure to cure the Property's contamination*. Moreover, over the past several years, the Property's contaminated, derelict nature has driven down the values of the various *other* properties in a quarter-mile radius, spawning a highly anomalous blighted area in the otherwise burgeoning Ironbound District and further cheating Newark out of tax monies.  In this action, Newark seeks to mitigate the substantial financial harm it has suffered and compel the Defendants to live up to their legal, environmental, ethical and corporate responsibilities.

## PARTIES AND JURISDICTION

9.      Plaintiff Newark is a municipal corporation formed and operating under the Laws of the State of New Jersey, and has the authority to initiate and prosecute legal actions.

10.     At times relevant to this complaint, Defendant DuPont owned the real property at 256 Vanderpool Street, Newark, New Jersey, and various adjacent and nearby properties, collectively designated herein as the Property, and operated thereon the pigment production facility designated herein as the Vanderpool Facility.

11.     At times relevant to this complaint, Defendant Heubach owned the

3

real property at 256 Vanderpool Street, Newark, New Jersey, and various adjacent and nearby properties, collectively designated herein as the Property, and operated thereon the pigment production facility designated herein as the Vanderpool Facility.

12.     At times relevant to this complaint, Defendant Cookson owned the real property at 256 Vanderpool Street, Newark, New Jersey, and various adjacent and nearby properties, collectively designated herein as the Property, and operated thereon the pigment production facility designated herein as the Vanderpool Facility.

13.     As Plaintiff and Defendants are located in New Jersey, as the Property is located in New Jersey, as the subject matter of this complaint sounds in New Jersey State Law, and as the acts and omissions of Defendant as alleged herein were made within this Court's jurisdictional area, this Court is the proper forum for trial in this action.

14.     Plaintiff is presently unaware of the true names or capacities, including whether they are individuals or business entities, of Defendant Does 1 through 10, and therefore sues them under such fictitious names, and will seek leave of this Court to insert true names and capacities once they are ascertained.

15.     At all times mentioned herein, Defendants, and each of them, inclusive of Does 1 through 10, were authorized and empowered by each other to act, and did so act as agents of each other, and all of the claims herein alleged to have been done by them were thus done in the capacity of such agency.  Upon information and

belief, all Defendants are responsible in some manner for the events described herein, and are liable to Plaintiff for the damages Plaintiff has incurred.

## ALLEGATIONS COMMON TO ALL COUNTS

16.    Plaintiffs repeat and reallege the allegations of all preceding paragraphs, as if the same were more fully set forth herein.

### Composition of the Property

17.    Various discrete parcels of land combine to form the Property – and, hence, the Vanderpool Facility. Pursuant to a detailed chain-of-title search Cookson engineered in 1999, and based on information from the City of Newark, New Jersey Tax Map, the Vanderpool Facility Property is composed of the following blocks and lots:

- Block 1170, Lot 33
- Block 1171, Lot 1
- Block 1172, Lots 1 and 27
- Block 1176, Lot 25
- Block 1177, Lots 40 and 58

18.    As it is instantly relevant, at various points throughout the late 19th and much of the 20th Centuries, DuPont, Heubach and Cookson owned and/or operated on the entirety of the Property.

19.    In 1903, Cawley Clark & Company built the first chemical plant on Vanderpool Street, and therein and thereon produced ultramarine pigment.

20.    In 1917, DuPont bought out Cawley, Clark & Company and purchased the Vanderpool Facility.  DuPont subsequently consolidated at the Vanderpool Facility the operations of several of its chemical manufacturing

factories. In 1947, DuPont's pigment production operations had grown so substantially, the company constructed a new, larger factory on the Property.

21.     In 1984, DuPont sold this expanded Vanderpool Facility and the Property to Heubach.  During its ownership of the Vanderpool Facility, Heubach reported its sales and profits increased by more than tenfold.

22.     Nonetheless, in 1988, Heubach sold the Vanderpool Facility and the Property to Cookson.  Continuously from 1988 until 1998, Cookson operated – and produced pigments at – the Vanderpool Facility, though the company did gradually wind down its pigment operations. In September 1998, pigment production at the Vanderpool Facility stopped completely.

23.     Between 1999 and 2002, Cookson demolished nearly all the Vanderpool Facility's buildings – leaving a single, small structure standing on the Property.

24.     Cookson presently owns all the blocks and lots that comprise the Property, with the exception of Block 1170, Lot 33. Cookson sold Block 1170, Lot 33 to Abrachem on September 1, 1998.  On September 12, 2002, Abrachem sold Block 1170, Lot 33 to Engel Holding Company. Finally, on August 5, 2005, Engel Holding Company sold Block 1170, Lot 33 to Mendel and Samuel Schwimmer Partnership.

20.     Of note, and as will be articulated *infra*, the hazardous wastes generated at the Vanderpool Facility have contaminated *at least* the properties specifically articulated herein. It is possible – indeed, *likely* – the Vanderpool Facility's contamination has spread or otherwise exists well beyond the Property's borders.  Plaintiff will consequently seek leave of this Court to amend this complaint

to include any unnamed property or properties so affected once the extent of the Vanderpool Facility's contamination has been fully and accurately ascertained.

### A History of Contamination

21.    Regardless of which Defendant owned it at any particular, pertinent time, for more than a century, the Property appears to have primarily supported the Vanderpool Facility's pigment production operations.

22.    Per New Jersey Department of Environmental Protection ("DEP") records, DuPont, Heubach and Cookson all manufactured the same products – namely, pigments – via the same operational processes at the Vanderpool Facility. Ergo, during each of their discrete tenures at the Property, records also indicate the Defendants used, generated and contaminated the Property with the same or similar hazardous substances.

23.    Defendants used, generated and/or disposed a variety of hazardous chemicals, and a significant subset of these chemicals is of acute concern, as they are especially toxic.

24.    For instant, Hexavalent Chromium (Cr[VI]) is present in extreme, imminently hazardous concentrations in multiple Areas of Concern (AOCs) across the Property.  Hexavalent Chromium concentrations in the Property's groundwater are as high as 519,000 ug/L – or *more than 7,000 times* higher than the New Jersey standard.  Similarly, Hexavalent Chromium concentrations in the Property's soil are as high as 14,100 mg/kg – or *more than 700  times* higher than the New Jersey standard.  The EPA explicitly states Hexavalent Chromium exhibits "extreme

7

toxicity" and has been "clearly established … as a human carcinogen." Hexavalent Chromium is a common byproduct of pigment production.

25.     Similarly, Lead is present in extreme, imminently hazardous concentrations at multiple AOCs across the Property.  Lead concentrations in the Property's soil are as high as 77,100 ppm – nearly *200 times* higher than the New Jersey residential standard.  Additionally, Lead has been detected in the Property's groundwater at levels far exceeding New Jersey Groundwater Quality Standards. As the Centers for Disease Control and Prevention have asserted, lead poisoning is so severe it "can affect nearly every system of the body."  This is especially true in children, as "even low levels of lead exposure can harm a child's mental development," and cause problems or conditions like reduced IQ, hearing issues, seizures and coma.  While it was a common byproduct of pigment production, Lead was also either leaked or improperly dispatched into the Property's soil and groundwater via activities in a "Lead Processing Area" at the Vanderpool Facility, process piping on the Property, and through and during various other Vanderpool Facility operations.

### The Defendants Have Defied Their Responsibility – and Multiple Mandates – to Clean Up the Property

25.     Though the DEP is technically overseeing the "remediation" of the Property and the Vanderpool Facility's contamination, remedial progress at the site has been virtually nonexistent.

26.     Per DEP documents, the Vanderpool Facility (and, hence, the

8

Property) is literally the *second oldest* Industrial Site Remediation Act ("ISRA") site in New Jersey. To wit, remediation of the Property "was Required to be Initiated" on May 4, 1984 - *more than three decades ago.*

27.     Over this period, in its futile effort to compel the Defendants to remediate the Property, the DEP has issued DuPont, Heubach and/or Cookson at least a dozen notices of either deficiencies or violations at the Property, and entered into an Administrative Consent Order with the Defendants. However, the Defendants have still done next to nothing to clean up the contamination at the Property.   To wit, the Defendants have yet to even conduct – let alone, submit the results of – a necessary Remedial Investigation – the first substantive step of the clean-up process.

29.     Consequently, the Property is still heavily contaminated – indeed, it sits in nearly the same state it did 30 years ago – and, thus, it remains extremely hazardous.

28.     Ironically, not only have Defendants done nearly nothing to remediate the Property, they may have actually *worsened* the contamination there: Per DEP records, Property may be *more contaminated now* than at the outset of the DEP's oversight of the Property's "clean-up." As DEP documents indicate, since the DEP commenced said oversight, Cookson has (1) engaged in "more than 20 discharges" which have "impacted groundwater," (2) operated an unapproved solid waste facility on the Property, (3) imported asphalt road millings to the Property, (4) illicitly discharged waste oil at the Property, ad (5) damaged the cover of an on-site landfill.

29.     DEP records indicate contamination generated at the Vanderpool Facility is not limited to the property: The Defendants dumped hazardous chemicals and wastes in such a manner that they directly contaminated properties as far away as the Newark Bay.

30.     Moreover, over the past 30 years, it is likely that many hazardous chemicals that could have been remediated or otherwise contained on the Property had the Defendants acted appropriately, have now migrated beyond the Property's borders, and have either impacted or threatened other proximate properties.

<u>Contamination Chills Development – of the Property and Abroad</u>

31.     Over the course of at least the past decade, multiple major industrial developers have entered into negotiations to purchase and develop the Property, only to back away once they uncovered the extent and severity of the Property's contamination.

32.     Cookson even attempted to sell the Property a major residential developer – only to see the DEP effectively *block the sale* due to the Property's severe contamination.   Upon information and belief, Sumo-Prime Newark Corporation and various affiliated companies reached an agreement to purchase the Property from Cookson.  However, the DEP intervened, expressing to Cookson that, were it to execute the sale, Cookson would "be in violation of ISRA." The DEP noted Sumo-Prime's interest in developing the Property residentially, and ostensibly disallowed it, stating, "The NJDEP does not consider residential use of the site to be appropriate at this time," as "[c]ontaminants, including Cr(VI) [Hexavalent

Chromium], remain in soil and groundwater at concentrations that far exceed concentrations that would suit residential use of the site."

33.     Thus, as the direct consequence of its severe, extensive contamination, the Property has sat empty and undeveloped for at least a dozen years, cheating the City out of tax revenues it would have received but for its contamination – and the Defendants' failure to timely remediate the toxic chemicals they illegally left behind.

34.     The Property's contamination is so extensive and severe, and its resultant status as a contaminated, derelict Brownfield is so notorious, it has had a deleterious impact on the values of surrounding properties. To this end, the Property has become what civil engineers and city planners call a TOAD – a "Temporarily Obsolete, Abandoned and Derelict" site. TOADS and similar Brownfields have been shown to reduce the value of properties in a quarter-mile radius by a factor of more than 30 percent. Consequently, as tax revenues are directly pegged to property values, for the various properties in a quarter-mile radius of the Property, Newark has been cheated out of substantial tax revenues.

36.     As the Property remains undeveloped and will remain undeveloped into the future, Newark will, until the Property is developed, receive less tax money than it would had Defendants timely remediate the Property.

### COUNT ONE: STRICT LIABILITY

37.     Plaintiff incorporates by reference Paragraphs 1 through 35 as if fully set forth herein.

38.     Per New Jersey Law, both the disposal of hazardous wastes into the

environment and the subsequent failure to remediate those wastes constitute abnormally dangerous activities.

39.     By timely failing to timely remediate the severe contamination they generated or otherwise created the Property, Defendants have engaged in abnormally dangerous activities at the Property.

40.     Defendants' conduct legally and proximately caused the damages Plaintiff has suffered and continues to suffer.

## COUNT TWO: NEGLIGENCE

41.     Plaintiff incorporates by reference Paragraphs 1 through 40 as if fully set forth herein.

42.     At all times pertinent, Defendants failed to exercise reasonable care, as they generated, utilized or otherwise created various hazardous chemicals at the Property, failed to properly dispose of those hazardous chemicals, and failed to timely remediate the resultant contamination they generated.

43.     It was reasonably foreseeable that, as a result of the above-described conduct of Defendants, the Property would fail to develop – and, consequently, fail to produce the amount of tax revenues for the City that it would have *had it developed*.

44.     It was further reasonably foreseeable that, as a result of the above-described conduct of Defendants, the Property would become a Brownfield and TOAD, and adversely impact the values of proximate properties, causing those properties to produce lesser tax revenues than they would have had the property been timely remediated.

45.    At the very least, Defendants' conduct thus constituted negligence, which was the legal and proximate cause of the damages Plaintiff has suffered and continues to suffer.

## COUNT THREE: PUNITIVE DAMAGES

46.    Plaintiff incorporates by reference Paragraphs 1 through 45 as if fully set forth herein.

47.    Defendants engaged in the aforementioned conduct with actual malice and/or a wanton and willful disregard of persons who foreseeably might be harmed by Defendants' acts or omissions.

48.    Defendants willingly engaged in such conduct with the knowledge that their conduct would cause substantial damages to various persons, including Plaintiff City.

49.    Therefore, Defendants are liable to the City for punitive and exemplary damages.

## PRAYER FOR RELIEF

**WHEREFORE,** based upon the foregoing allegations, Plaintiff demands a trial by jury, and respectfully requests this Court:

(a) to grant Judgment for Plaintiff against Defendants on all counts of this Complaint;

(b) to grant Plaintiff an award of damages representing the sums of money deprived and to be deprived of Plaintiffs on account of Defendants' wrongful conduct;

13

(c) to grant Plaintiff an award of punitive damages in such an amount as will sufficiently punish the Defendants for their conduct and prevent a repetition of such conduct in the future;

(d) to grant Plaintiff an award of attorney's fees; and

(e) to grant Plaintiff such additional relief as this Court deems just.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all causes so triable.

MATSIKOUDIS & FANCIULLO, LLC

By: _____          _____
    William Matsikoudis                Derek S. Fanciullo, Esq.

Dated: March 4, 2015

## <u>RULE 4:5-1 CERTIFICATION</u>

I certify, to the best of my information and belief, that the matter in controversy in this action is not the subject of any other action pending in any other court of this State. Furthermore, to the best of my belief, no other action or arbitration proceeding is contemplated in this matter.  Finally, other than the parties set forth in this pleading and previous pleadings, at the present time, I know of no other parties that should be joined in the within action.

MATSIKOUDIS & FANCIULLO, LLC

By: _____
Derek S. Fanciullo, Esq.
Attorney for Plaintiff

Dated: March 4, 2015

15